IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

UNITED STATES OF AMERICA,

Plaintiff,

vs.

WILLIE LEE JILES, and LEMARR
WASHINGTON,

Defendants.

NO. 8:23-CR-98

**MEMORANDUM AND ORDER ON
OBJECTIONS TO FINDINGS AND
RECOMMENDATION ON MOTIONS TO
SUPPRESS AND MOTIONS TO DISMISS**

The Government has charged Defendants Willie Lee Jiles and Lemarr Washington, with conspiring "to distribute and possess with intent to distribute 50 grams or more of methamphetamine (actual), its salts, isomers, and salts of its isomers, a Schedule II controlled substance," in violation of 21 U.S.C. §§ 841(a)(1) and 846. Filing 1. This charge stems from Defendants' encounters with law enforcement near mile marker 385 on Interstate 80 in Nebraska, during which time about seven pounds of methamphetamine were found in the vehicle the Defendants were traveling in. Filing 60 at 38, 49.

# I.  INTRODUCTION

## A.  Factual Background

United States Magistrate Judge Bazis's Findings and Recommendation discusses the facts pertinent to Defendants' Motions in greater detail. *See* generally [Filing 61 at 1](#)–8. The following background information provides context for the Court's ruling on Defendants' objections.[1]

Chase Parmer testified that he is a deputy with the Seward County Sheriff's Office and has been a law enforcement officer since January 2017. [Filing 60 at 11](#). In addition to his duties as a sheriff's deputy, Deputy Parmer testified that he works with a federal criminal interdiction task force with the "goal and objective [ ] to conduct high-volume traffic stops on the interstate in an effort to interdict criminals traveling with illegal contraband." [Filing 60 at 12](#).[2] This task force is administered by the United States Department of Homeland Security and includes personnel from the Drug Enforcement Administration. [Filing 60 at 52](#). Deputy Parmer testified that he has received specific training on interdiction and is an associate instructor for a major criminal interdiction training company. [Filing 60 at 12](#). Deputy Parmer testified that he stops around 30 to 40 vehicles per week while working with the task force. [Filing 60 at 12](#).

Deputy Parmer testified to his interdiction methods. He pulls over vehicles based on "indicators" of illegal activity, which he describes as "things that kind of rise my suspicions, things that just aren't normal from the baseline. And the accumulation of indicators makes me believe

---

[1] The Court has viewed the body cam and dash cam video captured by Deputy Parmer and his vehicle. [Filing 57](#) (Exs. 2, 3). Deputy Parmer's testimony of the events and conversations surrounding Defendants' arrest accurately reflects the recorded material. Where factual background information was not captured on video, the Court notes that the information is taken from Deputy Parmer's testimony at the suppression hearing.

[2] Deputy Parmer agreed that his "primary mission on the highway is to . . . intercept contraband" rather than "to enforce the traffic laws of the state of Nebraska." [Filing 60 at 40](#).

that the person is possibly involved in the criminal activity." Filing 60 at 12. Deputy Parmer also stated how indicators can be "dispelled." Filing 60 at 13. For example, a suspect's nervousness could be an "indicator" of criminal activity, but that indicator could be "dispelled" by learning that the suspect was nervous because he was traveling to cheat on a spouse rather than to transport contraband. Filing 60 at 13.

Deputy Parmer testified that he has handled a K-9, named Keisy, for over three years. Filing 60 at 14. Keisy has received annual certifications and trains every week with Deputy Parmer. Filing 60 at 14; *see also* Filing 57 (Ex. 1) (Nebraska Police Service Dog Certification). Deputy Parmer testified to Keisy's "alert" and "indicator" behaviors. As to the former, Keisy's "alert is like a change in behavior[,] . . . like an over-interest in a certain area of a vehicle or in a certain environment," and sometimes includes "[e]ars [ ] perking back." Filing 60 at 15. As to the latter, Keisy "has four type of indications. She'll sit down, stand, like, on all fours with a stand and freeze, or stand on the back two legs and have her front two legs up against something, usually if the odor is higher up." Filing 60 at 15–16.

Around 1:00 PM on March 2, 2023, Deputy Parmer was heading east on Interstate 80 near mile marker 385 as part of the criminal interdiction task force when he spotted a Chevrolet Equinox. Filing 60 at 18. Deputy Parmer followed the Equinox for about ten miles. Filing 60 at 49. Deputy Parmer testified that the driver of the Equinox—who turned out to be defendant Jiles—had committed "the violation of following too close." Filing 60 at 18.[3] Deputy Parmer described the violation as follows:

---

[3] Deputy Parmer also testified that "the tint of the [Equinox] was way too dark for any state level," but that the offense was not enforceable in Nebraska for vehicles registered out of state. Filing 60 at 22.

3

So the way that I go about enforcing following too close is the Nebraska Driver's Manual suggests a three-second following distance. That's what they believe is the time necessary to -- or for a person that sees a hazard to respond to that hazard.

And to best enforce this I do utilize a stopwatch; however, I have since switched to basic math. If a vehicle is traveling 75 miles an hour, in a single second it travels about 110 feet per second. So knowing that distance, I need to find distances on the interstate that I also know the same distance of; one being semis. Those are approximately 72 feet in length with the tractor and the trailer combined. Another one are the solid hash lines on the interstate system. The solid white lines dividing the two lanes are 10 feet long. The distance between them is 30 feet.

So I typically -- typically go from the beginning of one line to the end of a third line, and that is 90 feet in length. So by knowing that, if I see vehicles with only three hashes or just a single semi length in between them, I know that they are a second or less behind the vehicle in front of them.

Filing 60 at 19.[4] Deputy Parmer testified that the driver of the Equinox was following too closely—at an "approximately one-second following distance"—behind a tractor-trailer before switching lanes and following too closely behind an SUV. Filing 60 at 19–20. Deputy Parmer further testified that the Equinox was so close to the SUV that the Equinox obscured the SUV from his dash cam. Filing 60 at 20.

Before conducting a traffic stop, Deputy Parmer "utilized [his] license plate reader system where [he was] able to plug in the vehicle license plate, kind of see their travel, recent travel." Filing 60 at 23. Deputy Parmer discovered that the vehicle traveled west through Grand Junction, Colorado, which is near Utah, on February 27, 2023, and then returned going east through the same spot on March 1, 2023, two days later. Filing 60 at 23–24. On cross-examination, Deputy Parmer described the automatic license plate readers (ALPRs) in greater detail, stating:

[T]he system we use is called Vigilant. They make cameras. And there is [sic] thousands of these cameras throughout the United States. Some departments and

---

[4] Deputy Parmer acknowledged that the Nebraska Driver's Manual is not law, but rather a "rule of thumb established by [ ] a safety council[,] not a government entity." Filing 60 at 42–43.

4

state patrol companies will put these cameras, affix these cameras over high-traffic areas, whether it be interstates, highways, major roads downtown. They put the camera over those roadways in an effort to capture as many license plates as possible. So the images that it takes are then sent over to another database. It's separate from the license plate reader database. It sends them over to just Car Detector. It's Vigilant Car Detector, a separate thing you can log into.

And once I am logged in to that, I can plug in the license plate of any vehicle I wish, and it will show me wherever that vehicle license plate, an image of the vehicle license plate has been captured within the United States . . . [during the past] six months.

Filing 60 at 49–50. Deputy Parmer testified that the Equinox generated "only five or six" hits on the database. Filing 60 at 50. Also prior to stopping the Equinox, Deputy Parmer consulted "a law enforcement database, [ ] where [he] can search a vehicle['s] registered owners, check out the criminal history of any suspects, and see a bunch of other information." Filing 60 at 14. In doing so, Deputy Parmer discovered that the registered owner—defendant Washington's girlfriend, Tera Lynn Goodrich—had a "criminal history involving drug-trafficking charges." Filing 60 at 23. Deputy Parmer then conducted a traffic stop. Filing 60 at 23.

After Deputy Parmer stopped the Equinox, defendant Jiles, who was driving the vehicle, provided Deputy Parmer with his Wisconsin driver's license and the car registration. Filing 60 at 24, 27. While collecting the documentation from Jiles, Deputy Parmer testified that he "could smell an overwhelming odor of air freshener coming from the vehicle," that the smell "was so strong [he] believed it had just been sprayed," and that "simultaneously, [he] could smell what [he] believed to be marijuana." Filing 60 at 27. Deputy Parmer then requested that Jiles follow Deputy Parmer to his patrol vehicle. Filing 60 at 24.

In the patrol vehicle, Deputy Parmer conversed with defendant Jiles while Deputy Parmer prepared a written warning for the traffic violation. Filing 60 at 27. Jiles stated that the vehicle

belonged to his girlfriend and that the passenger—defendant Washington—was his friend. Filing 60 at 26. Jiles further stated that he and Washington were coming from "a bit past Nebraska" but "couldn't think of a city or state that he had gone to." Filing 60 at 26. Jiles stated that "the purpose of the trip was to look around" and that "[h]e was thinking about moving out of the state of Wisconsin." Filing 60 at 26. Jiles also said that "he was out there for about a day, a day and a half and that they were now headed back . . . to Milwaukee." Filing 60 at 26. Deputy Parmer asked Jiles "how many feet he believed he had in between him and the silver SUV." Filing 60 at 28. Jiles responded by "giv[ing] a hand measurement . . . of approximately six inches in length." Filing 60 at 28.[5]

While completing the written warning, Deputy Parmer "returned to the suspect vehicle to verify the vehicle VIN number, at which point [he] also spoke to Lemarr Washington briefly." Filing 60 at 33. Deputy Parmer asked Washington where he and Jiles had been, to which Washington that "they were in Las Vegas for two days." Filing 60 at 34. Deputy Parmer then checked the window tint to determine whether it was unlawfully dark—which it was, at 18 percent visible light transmission—and intended to give Jiles a verbal warning for the tint. Filing 60 at 34.[6]

Deputy Parmer testified that after issuing the written warning, he "got into a just normal conversation with Mr. Jiles." Filing 60 at 33. Deputy Parmer asked Jiles whether Jiles had any weapons, large amounts of money, or illegal narcotics in the Equinox. Filing 60 at 32–33. Deputy Parmer testified that this caused Jiles to become "flustered" and "his nervousness definitely

---

[5] On cross-examination, Deputy Parmer conceded that Jiles's following distance was likely greater than six inches. Filing 60 at 43. However, after reviewing the body camera footage in this case, defendant Jiles did, indeed, provide a hand measurement suggesting somewhere in the range of six inches.

[6] Deputy Parmer testified that checking the tint level was a "courtesy" for Defendants and not a basis for the traffic stop. Filing 60 at 39.

increased." Filing 60 at 32–33. Deputy Parmer sought consent to search the vehicle, which Jiles

denied. Filing 60 at 33. Deputy Parmer then "informed Jiles that he was detained" and "deployed

[his] K-9 [Keisy] around the vehicle." Filing 60 at 33. Deputy Parmer testified that Keisy displayed

"alert" behavior via "an over-interest in the driver's side of the suspect vehicle, over-interest in the

seams, and [then] also gave an indication, which was a sitting behavior." Filing 60 at 36. Deputy

Parmer then returned Keisy to the patrol vehicle and had Washington exit the Equinox. Filing 60

at 37. Deputy Parmer testified that he detected "an overwhelming odor of marijuana emitting from

the vehicle, and Washington stated that he and Jiles had smoked marijuana in Las Vegas." Filing

60 at 37. After detaining Washington in the patrol vehicle, Deputy Parmer searched the vehicle

and found seven pounds of crystal methamphetamine "in the rear cargo area of the suspect

vehicle." Filing 60 at 38. Additional facts relevant to the Court's disposition of this matter are

addressed below.[7]

## B.  Procedural Background

A criminal complaint was filed against Defendants on March 3, 2023, before United States

Magistrate Judge Michael D. Nelson. Filing 57 (Ex. 102). The complaint alleged that Defendants

"knowingly and intentionally, combined, conspired, confederated and agreed together and with

other persons known and unknown to the Grand Jury, to commit the following offense against the

United States: to distribute and possess with intent to distribute 500 grams or more of a mixture or

substance containing methamphetamine, its salts, isomers, and salts of its isomers, a Schedule II

---

[7] As previously noted, Judge Bazis's Findings and Recommendation addresses additional facts relevant to this case in greater detail. While Judge Bazis's Findings and Recommendation accurately reflects the facts of this case in greater detail, the undersigned has set forth the foregoing to provide context to the specific objections Defendants have raised. *See* Filing 61; Filing 66.

7

controlled substance, in violation of Title 21, United States Code, Section 841(a)(1)." Filing 57 (Ex. 102). Defendants were released from custody on March 8, 2023. Filing 57 (Ex. 101). On March 28, 2023, the Government moved to dismiss the complaint without prejudice, which Magistrate Judge Nelson granted. Filing 57 (Ex. 101). Defendants were indicted on April 19, 2023. Filing 1. The indictment charges Defendants with one count of conspiring "to distribute and possess with intent to distribute 50 grams or more of methamphetamine (actual), its salts, isomers, and salts of its isomers, a Schedule II controlled substance," in violation of 21 U.S.C. §§ 841(a)(1) and 846. Filing 1.

On July 11, 2023, defendant Jiles filed a Motion to Suppress, Filing 26, and a Motion to Dismiss the Indictment, Filing 28. On October 2, 2023, defendant Washington filed a Motion to Suppress, Filing 48 and a Motion to Dismiss, Filing 50. Defendants seek to suppress evidence obtained from the vehicle as fruits of an unlawful search in violation of the Fourth Amendment. *See* Filing 26 at 4. Defendants also seek dismissal of the Indictment as untimely under 18 U.S.C. § 3161(b). *See* Filing 28 at 3. After holding an evidentiary hearing on the Motions, Judge Bazis filed a Findings and Recommendation. Filing 61. Judge Bazis recommends that the Motions be denied. Filing 61 at 1. Jiles filed an objection on January 12, 2024, Filing 62, and Washington filed an objection on January 23, 2024, Filing 66. On February 2, 2024, the undersigned ordered the parties to submit additional briefing about the Fourth Amendment implications of using automatic license plate readers (ALPRs). Filing 67. This matter is now before the Court on Defendants' objections to Judge Bazis's Findings and Recommendations, in light of supplemental briefing submitted by the parties. After reviewing the matter *de novo*, the Court overrules Defendants'

objections, adopts Judge Bazis's findings of fact, and denies the Motions to Suppress and the Motions to Dismiss.

## II.  ANALYSIS

### A.  Applicable Standards

Under 28 U.S.C. § 636(b)(1), different standards of review apply when a party objects to a pretrial decision or a proposed findings of fact and recommendations by a magistrate judge. *See* 28 U.S.C. § 636(b)(1). When a party objects to a magistrate judge's proposed findings and recommendations, "[a] judge of the court shall make a de novo determination of those portions . . . to which objection is made." *Id.*; *accord Gonzales-Perez v. Harper*, 241 F.3d 633, 636 (8th Cir. 2001) (When a party timely objects to a magistrate judge's report and recommendation, the district court is required to make a de novo review of the record related to the objections . . . ."). The reviewing district court judge is free to "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1). If desired, a reviewing district court judge may "receive further evidence or recommit the matter to the magistrate judge with instructions." *Id.*

Under *de novo* review, a reviewing court "makes its own determinations of disputed issues and does not decide whether the magistrate[] [judge's] proposed findings are clearly erroneous." *Branch v. Martin*, 886 F.2d 1043, 1046 (8th Cir. 1989). *De novo* review is non-deferential and requires an independent review of the entire matter. *See Salve Regina Coll. v. Russell*, 499 U.S. 225, 238 (1991) ("When de novo review is compelled, no form of appellate deference is acceptable."); *United States v. Backer*, 362 F.3d 504, 508 (8th Cir. 2004) ("'De novo' is a Latin term literally meaning 'as new.' Our review is independent and not premised on the district court's

9

appropriate use of its discretion. We are concerned only with the proper application of the law . . . ."). When a party contests a magistrate judge's findings that resulted from an evidentiary hearing, the reviewing district court judge does not need to conduct another hearing. *See United States v. Raddatz*, 447 U.S. 667, 674 (1980) (holding that 28 U.S.C. § 636 "calls for a de novo determination, not a de novo hearing"). Instead, the district court discharges its duty by, at a minimum, listening to a tape recording or reading a transcript of the evidentiary hearing. *See United States v. Azure*, 539 F.3d 904, 910–11 (8th Cir. 2008). Here, the Court has read the transcript of the suppression hearing and has reviewed the exhibits admitted at the hearing.

Jiles and Washington each filed a "Statement of Objections" to Judge Bazis's Findings and Recommendation. *See generally* Filing 61; Filing 66. As discussed below, the issues Defendants raise in their Statements of Objections are narrower than the issues raised before Judge Bazis in their written submissions and at the suppression hearing. *See generally* Filing 26; Filing 27; Filing 28; Filing 48; Filing 49; Filing 50; Filing 60. Under the Federal Rules of Criminal Procedure, this Court "must consider de novo any objections to the magistrate judge's recommendation." Fed. R. Crim. P. 59(b)(3). However, a party's failure to object in accordance with Rule 59 "waives a party's right to review." Fed. R. Crim. P. 59(b)(2); *United States v. Merrett*, 9 F.4th 713, 716 (8th Cir. 2021) (noting that the defendant "did not object to the magistrate judge's order denying his motion, and his failure to object waives his right to review under Federal Rule of Criminal Procedure 59(a)"), *cert. denied*, 142 S. Ct. 815 (2022); *see also United States v. Chen*, No. CR 21-250 (JRT/TNL), 2023 WL 1466503, at *3 (D. Minn. Feb. 2, 2023) (quoting *Montgomery v. Compass Airlines, LLC*, 98 F. Supp. 3d 1012, 1017 (D. Minn. 2015)).

**B.  Preliminary Matters**

The Court begins with three preliminary matters. First, as the Court noted in a previous order, Filing 65, Washington's objection to the Findings and Recommendation, Filing 66 was untimely. The Court "defer[red] its decision on whether to consider any such untimely objections until it reviews the Findings and Recommendation." Filing 65. Although the Court could overrule Washington's objections as untimely, because Washington's objections are substantially the same as Jiles's objection, the Court will address them anyway. For the reasons explained below, both defendants' objections fail on the merits.

Second, defendant Jiles argues that "Deputy Parmer's use of the license-plate reader system violated Neb. Rev. Stat. § 60-3203(1)," contending that "[t]he violation of Nebraska's Automatic License Plate Reader Privacy Act certainly affects the reasonableness of the stop and the collection of this information, en masse, by law enforcement." Filing 70 at 3–4. Defendant Washington raises a similar argument:

> In *Katz v. United States*, 389 U.S. 347 (1967) the Court spoke of the reasonable expectation of privacy as something that would by necessity be not narrowed but analyzed through the lens of current applications. Although most courts have held that the initial use of plate readers in and of itself may not be an invasion of privacy, the courts struggle with what has become the springboard or use from reader-only to the vigilant car detector type or data. which can be accessed virtually instantaneously from the information provided by the reader. This has led various states, including Nebraska, to limit and in many situations prohibit, the use of ALPR. *See* Neb. Rev. Stat. 60-3202–3206 . The Nebraska statute prohibited the use of the APLR [sic] except in 10 specific uses including vehicles thought to be stolen, associated with an Amber Alert or a vehicle that is relevant and material to an ongoing criminal investigation. Neb. Rev. Stat. 60-3203(2)(vi), (vii), and (viii).
>
> . . .
>
> There can be no question that data acquisition such as in this case which included monitoring of personal travel should be found a violation of the Fourth Amendment.

11

Filing 71 at 3 (emphasis omitted). Defendants' arguments fail. As the Eighth Circuit Court of Appeals has explained,

> "[F]ederal courts do not suppress evidence seized by state officers in conformity with the Fourth Amendment because of state law violations." *United States v. Appelquist*, 145 F.3d 976, 978 (8th Cir. 1998). "When evidence obtained by state law enforcement officers is offered in a federal prosecution, the legality of the search and seizure is not determined by reference to a state statute, but rather is resolved by [F]ourth [A]mendment analysis." *United States v. Maholy*, 1 F.3d 718, 721 n.4 (8th Cir. 1993) (quotation and citations omitted)[.]

*United States v. Kelley*, 652 F.3d 915, 917 (8th Cir. 2011). Because "the legality of the search and seizure is not determined by reference to a state statute," *Maholy*, 1 F.3d at 721 n.4, Defendants' reliance on Nebraska state law are inapt and merit no further consideration.

Third, Defendants failed to object to Judge Bazis's finding that Deputy Parmer had probable cause to search the Equinox after a dog sniff indicated the presence of drugs. Filing 61 at 14–15. Although Defendants previously challenged whether probable cause existed to search the Equinox, Filing 26 at 3 (¶ 6) ("This search required, but lacked, probable cause."); Filing 48 at 1 (¶ 4) ("The subsequent warrantless search of the vehicle in which Washington was traveling was conducted without probable cause."), Defendants waived these challenges by failing to object to Judge Bazis's Findings and Recommendation. *See* Fed. R. Crim. P. 59(b)(2); *Merrett*, 9 F.4th at 716. Regardless, and for the same reasons that Judge Bazis articulated in her Findings and Recommendation, the Court concludes that there was probable cause.

### C. Objections Related to the Motions to Dismiss

In their briefing on the Motions to Dismiss, Defendants argued that dismissal under 18 U.S.C. § 3161(b) is appropriate because,

[T]he "charge" laid out in the complaint was a violation of 21 U.S.C. § 846 on March 2, 2023. That same "charge" -- a violation of 21 U.S.C. § 846 on March 2,

2023-- is alleged in the Indictment returned on April 19, 2023. Because "no indictment or information was filed within the [30-day] time limit," the "charge" – the violation of 21 U.S.C. § 846 on March 2, 2023 – which is now alleged in the indictment, "shall be dismissed or otherwise dropped."

Filing 28 at 3–4 (¶ 13); *see also* Filing 50 at 2–3 (¶¶ 9–10). In her Findings and Recommendation, Judge Bazis noted, and the parties concede, that under current Eighth Circuit precedent, "'when the government drops a complaint but then later brings a new complaint or indictment on the same charge, the 30-day period runs from the second complaint or indictment.' *United States v. Long*, 900 F.2d 1270, 1273 (8th Cir. 1990)." Filing 61 at 9. Judge Bazis concluded from this case law that "[t]he time between Defendants' arrest and the dismissal of the criminal complaint is not counted, nor is the time between the dismissal and the indictment counted. Because the thirty-day rule was not violated, Defendants' motions to dismiss should be denied." Filing 61 at 9. Although Defendants objected to Judge Bazis's recommendation that the Motions to Dismiss should be denied, Defendants explain that their objections are intended to "preserve the matter for appellate review." Filing 62 at 10; *see also* Filing 66 at 5.

The Court agrees with Judge Bazis that dismissal is not warranted under 18 U.S.C. § 3161(b). Defendants were indicted on April 19, 2023, which is more than 30 days after Defendants were arrested on March 2, 2023. Filing 1. However, the criminal charge filed against Defendants on March 3, 2023, was voluntarily dismissed without prejudice by the Government on March 29, 2023. Applying *Long*, "the time between the arrest and the dismissal of the first complaint is not counted." 900 F.2d at 1274. Accordingly, the period between March 2, 2023, and March 29, 2023, did not count against the 30-day rule. Because the period between March 29, 2023, and April 19, 2023, consists of fewer than 30 days, "[t]he 30 day rule was not violated." *Id.* The Court denies Defendants' Motions to Dismiss without considering the merits of Defendants' arguments that

13

Eighth Circuit precedent is wrong. *See Mallory v. Norfolk S. Ry. Co.*, 600 U.S. 122, 136 (2023) ("[A] lower court should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions. This is true even if the lower court thinks the precedent is in tension with some other line of decisions." (internal quotation marks and citations omitted)); *Hood v. United States*, 342 F.3d 861, 864 (8th Cir. 2003) (noting that district courts located within the Eighth Circuit are "bound ... to apply the precedent of this Circuit"); *M.M. ex rel. L.R. v. Special Sch. Dist. No. 1*, 512 F.3d 455, 459 (8th Cir. 2008) (noting it is "fundamental error" to disregard circuit precedent).

### D.  Objections Related to the Traffic Stop

#### 1.  *Judge Bazis's Findings and the Parties' Objections*

Judge Bazis found that Deputy Parmer had probable cause to believe that defendant Jiles committed a traffic violation which justified Deputy Parmer in stopping the Equinox. Filing 61 at 10–11. Specifically, Judge Bazis found that "Deputy Parmer had an objectively reasonable basis for believing there was a traffic violation for following-too-closely" in violation of Neb. Rev. Stat. § 60-6,140(1). Filing 61 at 10. Judge Bazis found that the video from Deputy Parmer's dash cam supported Deputy Parmer's testimony, observing:

> The video from the dash camera shows the Equinox quickly approaching a semi and then moving into the other lane to pass the semi. When Jiles moved to the passing lane, he was then following an SUV. The exact distance between the Equinox and SUV is not entirely clear from the dash cam recording due to the proximity of the vehicles to one another.

Filing 61 at 10. Judge Bazis also referenced defendant Jiles's "indicat[ion] [that] he was approximately six inches behind the SUV and acknowledge[ment] that he was probably following the SUV too closely"—which was captured by Deputy Parmer's body camera—to support her

14

finding of probable cause. Filing 61 at 10. Finally, Judge Bazis gave credence to Deputy Parmer's role as "an experienced officer with numerous years of experience." Filing 61 at 11. Having reviewed the matter *de novo*, the Court agrees with these findings and adopts them.

Defendant Jiles's[8] objection disputes that Deputy Parmer had even reasonable suspicion—never mind probable cause—to stop the Equinox. Filing 62 at 2. The gravamen of his argument is that the maneuver which led to the traffic stop was reasonable and therefore not in violation of Neb. Rev. Stat. § 60-6,140(1), which provides that "[t]he driver of a motor vehicle shall not follow another vehicle more closely than is reasonable and prudent, and such driver shall have due regard for the speed of such vehicles and the traffic upon and the condition of the roadway." Filing 62 at 2–3. Jiles contends that the dash camera video shows "the afternoon sun was out, visibility was 100%, the pavement was dry, and the road – a four-lane interstate divided by a sizeable median and flanked by shoulders on either side of it – was straight." Filing 62 at 3. Jiles further contends that "nothing about the passing of the semi was imprudent or unreasonable" and that "the white Equinox did not follow the SUV in an unreasonable or imprudent manner." Filing 62 at 4–5. Regarding Jiles's admission of following too closely, he argues that "Jiles' 'concesssions' [sic] within the cruiser carry little or no legal weight: the question is not 'what did Deputy Parmer get Mr. Jiles to agree to?'; the question is 'Was there an objectively reasonable basis to believe the law had been violated?'" Filing 62 at 6. Because Jiles believes the answer to the latter question is "no," he argues that the traffic stop violated his rights under the Fourth Amendment. Filing 62 at 7.

---

[8] Defendant Washington's arguments are substantially the same as Jiles's arguments. Because Jiles's objections are more detailed, the Court addresses both Defendants' arguments by addressing Jiles's.

2. *Applicable Standards*

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]" U.S. Const. amend. IV. "A traffic stop constitutes a seizure for Fourth Amendment purposes" and therefore must be reasonable. *United States v. Pappas*, 452 F.3d 767, 771 (8th Cir. 2006) (citing *Whren v. United States*, 517 U.S. 806, 809–10 (1996)). The Eighth Circuit has explained,

> To be reasonable, a traffic stop must be supported by, at a minimum, "a reasonable, articulable suspicion that criminal activity" is occurring. *United States v. Jones*, 269 F.3d 919, 924 (8th Cir. 2001). A traffic violation provides probable cause to the police to meet the constitutional reasonableness requirement. *United States v. Ehrmann*, 421 F.3d 774, 780 (8th Cir. 2005).

*Pappas*, 452 F.3d at 771. "An officer's observance of a traffic violation, no matter how minor, gives the officer probable cause to initiate a stop." *United States v. Banks*, 43 F.4th 912, 916 (8th Cir. 2022) (citing *United States v. Cox*, 992 F.3d 706, 709 (8th Cir. 2021)). The Eighth Circuit has also weighed in on the specific violation alleged here—a violation of Neb. Rev. Stat. § 60-6,140(1)—as follows:

> Nebraska law prohibits "follow[ing] another vehicle more closely than is reasonable and prudent." Neb. Rev. Stat. § 60-6,140(1). This statute contains no numerical criteria for assessing whether a driver's following distance is reasonable, but we have stated "that when one car trails another by less than two seconds, an officer will generally have probable cause to believe that the trailing car is closer than what is reasonable and prudent." *United States v. Andrews*, 454 F.3d 919, 922 (8th Cir. 2006). After observing the Altima traveling less than a second behind another vehicle, [the officer] reasonably concluded that the driver's following distance was not reasonable and prudent. He thus had probable cause for a traffic stop, and the district court properly denied the motion to suppress.

*Banks*, 43 F.4th at 916–17.

*3. Application*

The Court concludes that Deputy Parmer had the requisite "reasonable, articulable suspicion that criminal activity" was occurring when he stopped the Equinox. *Jones*, 269 F.3d at 924. Specifically, Deputy Parmer observed the Equinox following the SUV too closely in violation of Neb. Rev. Stat. § 60-6,140(1), which "provide[d] probable cause to . . . meet the constitutional reasonableness requirement." *Ehrmann*, 421 F.3d at 780. Deputy Parmer's observation is well-supported by the dash cam video, his testimony before Judge Bazis, and defendant Jiles's admission of following too closely.

Regarding the dash cam video and Deputy Parmer's testimony, the Court makes several observations. First, Deputy Parmer's testimony that the Equinox "was traveling approximately 75 miles per hour," Filing 60 at 20, is supported by the video. Filing 57 (Ex. 3). Deputy Parmer mostly traveled between 77 and 85 miles per hour while slowly gaining on the Equinox before conducting a traffic stop. Filing 57 (Ex. 3). Deputy Parmer further testified that a vehicle traveling 75 miles per hour travels about 110 feet per second.[9] As noted above, the Eighth Circuit has determined that an officer is justified under Neb. Rev. Stat. § 60-6,140(1) in stopping a vehicle that "trails another by less than two seconds." *Andrews*, 454 F.3d at 922 ("We think that when one car trails another by less than two seconds, an officer will generally have probable cause to believe that the trailing car is closer than what is reasonable and prudent."). Although Deputy Parmer testified that he uses a three second standard, Filing 60 at 18–19, he also testified that as the Equinox "rushed up on th[e] semi" the Equinox had an "approximately one-second following distance, before it ended up

---

[9] Deputy Parmer's math is correct. One mile is equal to 5,280 feet. One hour is equal to 3,600 seconds. Thus, (75 miles / 1 hour) * (5,280 feet / 3,600 seconds) = 110 feet / 1 second.

switching lanes and then switched to the inside lane of travel where it began to follow a silver SUV . . . at a less than a one-second following distance." Filing 60 at 20. This testimony is also supported by the video. It appears likely that the Equinox trailed both the semi and the SUV by less than 110 feet (a one-second following distance) and almost certain that the Equinox trailed these vehicles by less than 220 feet (a two-second following distance). Therefore, both the video and Deputy Parmer's testimony support finding that Deputy Parmer had "at a minimum, 'a reasonable, articulable suspicion that criminal activity' [wa]s occurring." *Jones*, 269 F.3d at 924.

Jiles's admission that he was following the SUV at a distance of about six inches provides further evidence that he was following too closely. The Court agrees with Jiles that "the question is not 'what did Deputy Parmer get Mr. Jiles to agree to?'" but instead whether "there [was] an objectively reasonable basis to believe the law had been violated." Filing 62 at 6. As discussed above, both the dash cam video and Deputy Parmer's testimony give an objectively reasonable basis to believe the Equinox was following too closely in violation of Neb. Rev. Stat. § 60-6,140(1). Moreover, particularly given that Jiles's following distance behind the SUV is not visible from Deputy Parmer's dashboard camera, Jiles's admission that he was following the SUV too closely can serve as substantive evidence that he was, indeed, following too closely. *See* Fed. R. Evid. 801(d)(2) (party admission). Although Deputy Parmer conceded that Jiles's following distance was likely greater than six inches, Filing 60 at 43, Jiles's admission bolsters Deputy Parmer's observation and the Court's conclusion that Jiles was following too closely. Accordingly, the Court agrees with Judge Bazis that Deputy Parmer had probable cause—and at the very least, reasonable suspicion—to stop the Equinox.

### E.  Objections Related to the Prolonged Traffic Stop

#### 1.  *Judge Bazis's Findings and the Parties' Objections*

Judge Bazis found that, "[b]ased on the totality of the circumstances," Deputy Parmer had reasonable suspicion to further detain Jiles and Washington after the traffic stop was complete. Filing 61 at 11–13. One such circumstance was "the suspicious nature of Defendants' reported travel plans." Filing 61 at 12. Jiles's statement that Defendants "were coming from a little bit past Nebraska, but . . . did not know the name of where they were coming from . . . did not make sense because Jiles said the purpose of the trip was for him to look for a place to move." Filing 61 at 12. Judge Bazis also noted that Jiles's statement "conflicted with what the [A]LPR system told [Deputy Parmer], so Deputy Parmer knew Jiles was being dishonest." Filing 61 at 12. Another circumstance Judge Bazis found to support reasonable suspicion was "the inconsistency between Defendants' statements." Filing 61 at 12. Finally, other circumstances that Judge Bazis noted included the "overwhelming odor of air freshener coming from the vehicle," "the occupants of the Equinox moving around a lot in the vehicle," "Jiles['s] [ ] nervous[ness] during the encounter," and "Jiles['s] . . . comments that his record was clean, and repeated[ ] mention[s] that he had to go to the bathroom," which Judge Bazis recognized as attempts "to speed the traffic stop along." Filing 61 at 12.

Defendant Jiles's objection disputes that Deputy Parmer had reasonable suspicion to prolong the stop to perform a dog sniff. Filing 62 at 7–9. Jiles contends that his answers were consistent with Washington's, explaining:

> The relevant exchange between Mr. Jiles and Deputy Parmer demonstrates that Parmer asked Jiles, "You guys been on the road long *today*?" Immediately after that question, Parmer asked, "Whereabouts are you coming from?" Jiles was unable to name an exact city, only able to say a "little bit" west past Nebraska. *Id.*

Indeed, this exchange formed a great deal of Deputy Parmer's suspicion, especially after he learned from Mr. Washington (the passenger) that they'd been to Las Vegas. But, if one listens to the exchange carefully, it is clear that Mr. Jiles simply imputed Deputy Parmer's use of the word "today" to both questions. Put another way, the first question asked how long Mr. Jiles had been on the road *today* and the second question asked where[abouts] he had come from *that day*. It makes sense that, for a pair of guys on the road from Las Vegas to Wisconsin who had spent the night of March 1 in Colorado, Willie Jiles might not know the exact name of the city "whereabouts [he was] coming from" *that day*. As such, Jiles' account was not inconsistent with Mr. Washington's explanation that the pair had been to Las Vegas.

Filing 62 at 8–9 (record citations omitted) (emphasis in original). Jiles contends that Deputy Parmer's conclusion that Jiles's account was inconsistent with Washington's "was an unreasonable mistake." Filing 62 at 9. Specifically, Jiles argues that Deputy Parmer's "failure to ask clarifying questions and assumption that an obvious misunderstanding should be elevated to the level of suspicion was unreasonable." Filing 62 at 9.

Washington also objected to Judge Bazis's finding that Deputy Parmer had reasonable suspicion to prolong Defendants' detention. As with Washington's objections to the traffic stop, many of Washington's objections to the prolongation are similar to Jiles's. However, some of Washington's objections diverge from Jiles's into frivolity. *See* Filing 66 at 3–5. For example, Washington argues that "the Fourth Amendment does not protect unreasonable action but protects that which is reasonably and objectively reasonable." Filing 66 at 4. Putting aside the question of what it means to be "reasonably . . . reasonable," the Court notes that the Fourth Amendment does not protect police conduct but instead guarantees that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated[.]" U.S. Const. Amend. IV. Washington goes on to argue,

The stop was more likely predicated upon the information received from the license reader and vehicle identifier than the driving itself. A review of the video will

20

> illustrate that the driving exhibited was reasonable given the circumstances of the slower semi, the traffic[,] and road conditions. Given the straight and level nature of the road it isn't clear that the officer could observe the distance between the Equinox and the SUV in a manner sufficient to satisfy Nebraska law. This may have been why the Officer wanted Jiles to incriminate himself even though Jiles may have just wanted to be agreeable, get his ticket, and go home.

Filing 66 at 4–5. The Court fails to see how any part of this argument is relevant to the prolonged traffic stop. Neither Deputy Parmer nor Judge Bazis ever cited the traffic violation as a justification for prolonging the stop. *See generally* Filing 60; Filing 61. Moreover, whether Deputy Parmer "wanted Jiles to incriminate himself" is also irrelevant because "Fourth Amendment reasonableness 'is predominantly an objective inquiry' . . . '*whatever* the subjective intent' motivating the relevant officials" might have been. *Ashcroft v. al-Kidd*, 563 U.S. 731, 736 (2011) (emphasis in original) (citations omitted). Because Washington's remaining arguments relate but do not add to the arguments made by Jiles, they merit no further discussion.

### 2. *Applicable Standards*

The quintessential case discussing the prolongation of traffic stops for dog sniffs is *Rodriguez v. United States*, 575 U.S. 348 (2015). In Rodriguez, the Supreme Court stated that "a dog sniff . . . is not an ordinary incident of a traffic stop" and "is not fairly characterized as part of the officer's traffic mission." *Id.* at 356. "A dog sniff, by contrast, is a measure aimed at 'detect[ing] evidence of ordinary criminal wrongdoing.'" *Id.* at 355 (citations omitted). If "conducting the sniff 'prolongs'—i.e., adds time to—'the stop,'" the officer must have "the reasonable suspicion ordinarily demanded to justify detaining an individual." *Id.* at 355, 357. "In other words, if an officer's unrelated investigations extend the traffic stop beyond the time reasonably required to achieve the mission of issuing a ticket, he must have reasonable suspicion of some other criminal activity." *United States v. Betts*, 88 F.4th 769, 773 (8th Cir. 2023) (cleaned

21

up) (citing *Rodriguez*, 575 U.S. at 350–351). The Eighth Circuit has explained what is demanded

by "reasonable suspicion," as follows:

> "Reasonable suspicion requires 'specific and articulable facts which, taken together
> with rational inferences from those facts, amount to reasonable suspicion that
> further investigation is warranted.'" *Gonzalez-Carmona*, 35 F.4th at 641 (citation
> omitted). This concept is "not readily, or even usefully, reduced to a neat set of
> legal rules." *Illinois v. Gates*, 462 U.S. 213, 232, 103 S.Ct. 2317, 76 L.Ed.2d 527
> (1983). Accordingly, our review of reasonable suspicion "looks to the totality of
> the circumstances, 'allow[ing] officers to draw on their own experience and
> specialized training to make inferences from and deductions about the cumulative
> information available to them.' " *United States v. Dortch*, 868 F.3d 674, 680 (8th
> Cir. 2017) (alteration in original) (quoting *United States v. Arvizu*, 534 U.S. 266,
> 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002)). Still, we view the totality of the
> circumstances not from an individual officer's subjective standpoint, but from the
> standpoint of an objectively reasonable officer. *Ornelas v. United States*, 517 U.S.
> 690, 696, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996).

*Betts*, 88 F.4th at 773–74. "Furthermore, if in the process of questioning the individual the officer

develops a reasonable suspicion or probable cause to believe that a crime is being committed by

that individual, the officer may take further, reasonable action to confirm or dispel that suspicion

or probable cause." *United States v. Turner*, 934 F.3d 794, 798 (8th Cir. 2019).

    *3. Application*

    The traffic stop had ended when Deputy Parmer deployed his K-9, Keisy, to perform a dog

sniff. *See* Filing 60 at 32 (Deputy Parmer "was at the conclusion of the traffic stop when [he] had

issued the warning to Mr. Jiles," which preceded the dog sniff). Thus, the Court must determine

whether the "detention for the dog sniff . . . was [ ] independently supported by individualized

suspicion." *Rodriguez*, 575 U.S. at 357. "[L]ook[ing] [at] the totality of the circumstances" and

"allow[ing] officers to draw on their own experience and specialized training to make inferences

from and deductions about the cumulative information available to them." *Dortch*, 868 F.3d at

680, the Court concludes that Deputy Parmer's detention of Defendants for the dog sniff was justified by his reasonable suspicion of illegal activity.

> a. Inconsistencies Between Jiles's Statements, Washington's Statements, and ALPR Data

Deputy Parmer stated that there "was an accumulation of things" that made Deputy Parmer suspicious that Jiles and Washington were engaged in criminal activity. Filing 60 at 29. The Court will address these indicators in turn, beginning with inconsistencies between data collected by the ALPRs and conflicting statements made by Jiles and Washington. Regarding the suspicion that information from the ALPRs aroused, Deputy Parmer testified,

> [T]he license plate reader database show[ed] a very quick turnaround trip.
>
> Basically, where the license plate readers are affixed, that captured the suspect vehicle. They were on the far west side of Colorado. So Colorado has those license plate readers in that area to, basically, get traffic that is coming in and out of their state. So one could reasonably assume that the vehicle went as far west as Utah.
>
> . . .
>
> And when I had Mr. Jiles accompany me back to my car, he was unable to think of a city or a state that he had visited, even though he stated that he was -- the purpose of the trip was to kind of look for a place where he was possibly thinking about moving.
>
> So in my head I am wondering, well, how did you get to that area and how do you -- do you put something in your GPS, how you just wind up out in this area and not know where you are at.
>
> He stated that the duration of the trip was about a day or a day and a half, and it took him several seconds to even think about the duration of the trip when asked. And a short trip like that should have a really quick response.
>
> . . .
>
> [Jiles stated that] [t]he duration of the trip was about a day and a half, and the license plate readers conflicted that, and I knew that he was being dishonest with me.

Filing 60 at 29–31.

Deputy Parmer also testified that his suspicion was raised by Washington's statements, which Deputy Parmer deemed inconsistent with Jiles's. Washington stated that he and Jiles were returning from Las Vegas, Filing 60 at 34, whereas Jiles stated that he and Washington were coming from "a bit past Nebraska" but "couldn't think of a city or state that he had gone to." Filing 60 at 26. Deputy Parmer found this suspicious, testifying:

> Las Vegas is a very well known city. Anybody that travels there would know and remember the name of the city and state. And it is also much further west than a little bit past Nebraska. So based on those two major differences, I knew that the suspects -- one of the suspects was definitely lying about the location of their trip.

Filing 60 at 35.

"Contradictory statements establish the reasonable suspicion necessary to detain a motorist further and to interview passengers." *United States v. Pulliam*, 265 F.3d 736, 740 (8th Cir. 2001) (citing *United States v. Edmisten*, 208 F.3d 693, 694 (8th Cir. 2000)). In addition, where an "interview of the passenger reveal[s] more inconsistencies[,] . . . "[t]hese inconsistencies [may] justif[y] [a suspect's] further detention while [the officer] continue[s] to investigate." *Id.* "A suspect's displaying characteristics of the drug courier profile, when coupled with untruthful answers given to police questioning, together may constitute sufficient basis for an investigative, *Terry*-type seizure." *United States v. Poitier*, 818 F.2d 679, 683 (8th Cir. 1987). Here, even if Jiles is correct that his statements can be construed in a way that are not inconsistent with information from the ALPRs and Washington, *see* Filing 62 at 8, it reasonably appeared to Deputy Parmer that either Jiles or Washington was being untruthful. Because untruthful answers to police questioning and inconsistent statements between alleged coconspirators can give rise to reasonable suspicion, *see Poitier*, 818 F.2d at 683; *Pulliam*, 265 F.3d at 740, these factors help to justify Deputy Parmer's prolonged detention of Defendants.

24

b. Deputy Parmer's Knowledge that the Vehicle Owner Was a
Convicted Drug Trafficker

Deputy Parmer also testified that he was suspicious because he "had run the registered owner's information prior to the traffic stop and noticed the drug-trafficking charge on there." Filing 60 at 29. Knowledge of a prior conviction for a presently suspected offense can contribute to reasonable suspicion. *See United States v. Makeeff*, 820 F.3d 995, 1001 (8th Cir. 2016) (knowledge of a suspect's "prior conviction for possession of child pornography" was the first of seven facts contributing to officer's reasonable suspicion justifying seizure of a USB drive); *United States v. Humphrey*, 753 F.3d 813, 816 (8th Cir. 2014) ("Knowing of Humphrey's past convictions for violent conduct and a firearms offense, Burgdorf had reasonable suspicion of an imminent, unlawful assault on Martorano, which justified a *Terry* stop."); *United States v. Williams*, 577 F.3d 878, 881 (8th Cir. 2009) ("[T]he police officer's knowledge of his prior conviction for unlawful possession of a firearm [ ] support[ed] the officers' reasonable suspicion that an unknown individual in the home could pose a danger to them."). Here, even though the owner was not in the vehicle—which Deputy Parmer must have known, considering the owner was a female and both Defendants are males—the fact that Defendants occupied a vehicle belonging to a convicted drug trafficker contributed to Deputy Parmer's reasonable suspicion of illegal activity. *See also United States v. Fuse*, 391 F.3d 924, 929 (8th Cir. 2004) (driving a car not belonging to defendants was a fact contributing to reasonable suspicion).

c. The Air Freshener

Deputy Parmer further noted that he experienced an "overwhelming odor of air freshener emitting from the car" and "could also see air fresheners within the vehicle." Filing 60 at 30. "[A] strong odor of air freshener" can reasonably raise an officer's suspicions. *Fuse*, 391 F.3d at 929.

25

In *Fuse*, the officer knew that "drug smugglers commonly use air freshener to mask the odor of controlled substances." *Id.* Here, Officer Parmer testified that he "believed [he] had smelled marijuana odor, but it was masked too heavily by the air freshener smell." Filing 60 at 30. Like in *Fuse*, the "strong odor of air freshener" emitting from Defendants' vehicle contributed to Deputy Parmer's reasonable suspicion.

> ### d.   Defendants' Demeanors

Deputy Parmer testified to the unusually nervous demeanors of Jiles and Washington, as follows:

> When I initiated the traffic stop, the suspect vehicle -- I could see two occupants doing a lot of moving around within the vehicle, which is easily visible on camera.
>
> . . .
>
> Mr. Jiles was also very nervous, touching of the face, sweating, very -- watching me very intently. Kept saying comments that his record is clean, he's got nothing, like, he's all good and stated that, you know, the duration of the trip -- I am not sure if I mentioned this already.

Filing 60 at 30–31. Deputy Parmer further testified that the Jiles differed from a nonsuspicious person because unlike Jiles, the "normal traveling public" are "able to give a city and a state where they're coming from [and] the purpose of the trip"; "not nervous"; and "not trained to convince [Deputy Parmer] that their record is clean and that they've never had any criminal charges on their record." Filing 60 at 31. The Eighth Circuit has stated that "nervousness is generally of limited significance and must be treated with caution when analyzing reasonable suspicion, [but] it is not so limited when combined with 'other more revealing facts.'" *Betts*, 88 F.4th at 774–75 (quoting *United States v. Jones*, 269 F.3d 919, 928–29 (8th Cir. 2001)). Because there are many "revealing facts" that gave Deputy Parmer reasonable suspicion, Defendants' nervousness bolsters the Court's conclusion.

26

e.   The "Totality of the Circumstances"

The Court concludes that Deputy Parmer had reasonable suspicion of illegal activity to prolong Defendants' detention while he conducted a dog sniff. Deputy Parmer knew that Jiles's statements were contradicted by Washington's and by information gathered by the ALPRs; that Defendants occupied the vehicle of a convicted drug trafficker; that there was a strong odor of air freshener likely used to mask the scent of contraband; and that Defendants exhibited nervous and erratic behavior consistent with illegal activity. Moreover, contrary to Jiles's arguments, *see* Filing 62 at 9, Defendants did nothing to dispel Deputy Parmer's suspicions, and further questioning would not have done so, either. *See Turner*, 934 F.3d at 798. Instead, each inquiry by Deputy Parmer further solidified his reasonable suspicion.

Eighth Circuit caselaw supports the Court's conclusion that Deputy Parmer had reasonable suspicion. In *Fuse*, the Eighth Circuit found that an officer had reasonable suspicion under the following circumstances:

> Trooper Rule, who is an experienced officer trained in highway drug interdiction, testified at the suppression hearing about several facts that raised his suspicion: (1) a strong odor of air freshener, which was significant to Trooper Rule, because drug smugglers commonly use air freshener to mask the odor of controlled substances; (2) Fuse's prior arrest; (3) the car did not belong to Fuse or Burgie; (4) Fuse and Burgie were traveling from California, a "source state" for illegal narcotics; (5) Fuse's unusual explanation for traveling to Kansas City; (6) Fuse's and Burgie's continued, unusual nervousness even after Trooper Rule advised them he was issuing only a warning citation; and (7) Trooper Rule's observation of a mobile telephone and "NoDoz" in the car.

*Fuse*, 391 F.3d at 929. The Fuse court distinguished an earlier case, *United States v. Beck*, 140 F.3d 1129 (8th Cir. 1998), where there was no reasonable suspicion under the following circumstances:

(1) Beck was driving a car that had been rented by an absent third party; (2) the car was licensed in California and was stopped in Arkansas; (3) there was fast food trash on the passenger-side floor; (4) there was no visible luggage in the car; (5) Beck appeared nervous; (6) Beck was traveling from a source state to a drug demand state; and (7) the officer disbelieved Beck's explanation for his trip.

*Fuse*, 391 F.3d at 929–30 (quoting *Beck*, 140 F.3d at 1137).

Here, Deputy Parmer, "an experienced officer trained in highway drug interdiction," articulated reasons for detaining Defendants that are closer to—if not stronger than—the rationale that constituted "reasonable suspicion" in *Fuse*. Like in *Fuse*, Deputy Parmer noted that "a strong odor of air freshener" emanated from Defendants' car; that the registered owner of the car had not only a "prior arrest," but a conviction for drug trafficking; that "the car did not belong to" Defendants; that Defendants had an "unusual explanation" for their travels; and that Defendants exhibited "continued, unusual nervousness." *Fuse*, 391 F.3d at 929. The Eighth Circuit has also acknowledged "Las Vegas [as] a collection point for drug trafficking." *Betts*, 88 F.4th at 771.

Finally, although the Court determines below that use of the ALPR database does not violate the Fourth Amendment, even if such use is unconstitutional, the "totality of the circumstances"—including Defendants' use of a vehicle registered to a convicted drug trafficker, their nervous demeanors, inconsistent answers about their trip, and heavy use of air freshener—independently supported Deputy Parmer's reasonable suspicion, which in turn justified detaining Defendants after the traffic stop was complete. Accordingly, even without considering the information obtained from the ALPRs, the Court agrees with Judge Bazis that Deputy Parmer had reasonable suspicion to prolong Defendants' detention for the dog sniff.

### F. Legality of the Automatic License Plate Reader System

Judge Bazis noted that Jiles's statement that Defendants were "were coming from a little bit past Nebraska" was suspicious, in part, because the statement "conflicted with what the [A]LPR system told [Deputy Parmer], so Deputy Parmer knew Jiles was being dishonest." Filing 61 at 12. Judge Bazis further noted Defendants' argument "that use of license plate readers violated their Fourth Amendment rights" was first raised "at the evidentiary hearing due to testimony that was elicited during the hearing." Filing 61 at 15 n.5. Judge Bazis determined, "Based on the undersigned's conclusion that the traffic stop was supported by probable cause, and under the totality of the circumstances, there was reasonable suspicion to detain Defendants, the undersigned will not address this issue [of the ALPR system] in this Findings and Recommendation." Filing 61 at 15 n.5. In his objections, Jiles requested that "further briefing should be ordered regarding the Fourth Amendment implications of using this data in a reasonable-suspicion analysis." Filing 62 at 9 n.7. The Court ordered additional briefing on this issue. Filing 67. Defendants and the Government filed briefs. Filing 68; Filing 69; Filing 70; Filing 71.

#### 1. The Parties' Arguments

Jiles argues,[10] "The indiscriminate collection of license-plate location information into a government-accessible database is an unreasonable and warrantless search under the Fourth Amendment," and as such, "the Court should not consider that data in its reasonable-suspicion analysis on the prolongation issue." Filing 68 at 1. Jiles cites *United States v. Jones*, 565 U.S. 400 (2012), and *Carpenter v. United States*, 585 U.S. 296 (2018), for the proposition that Deputy

---

[10] Defendant Washington's brief largely reiterates arguments made by Jiles. *See generally* Filing 71. Thus, the Court's analysis of Jiles's arguments also encompasses Washington's.

Parmer's warrantless use of the ALPRs constituted an unreasonable search in violation of the Fourth Amendment. Filing 68 at 5–9. Because Deputy Parmer relied on information obtained by the ALPRs when he prolonged Defendants' detention, Jiles argues that "the Court should excise from its prolonged-stop reasonable-suspicion analysis any consideration of the data from the license-plate-reader system." Filing 68 at 9.

In response, the Government argues that while more extensive surveillance systems can constitute unreasonable searches, use of ALPRs alone do not violate the Fourth Amendment. Filing 69 at 4. The Government notes, "While the Eighth Circuit has not addressed the use of the [A]LPR[s], others have," including the Ninth Circuit, *United States v. Yang*, 958 F.3d 851 (9th Cir. 2020) (Bea, J., concurring), and the Fourth Circuit, *Leaders of a Beautiful Struggle v. Baltimore Police Department*, 2 F.4th 330 (4th Cir. 2020) (en banc). Filing 69 at 2–4. The Government further states that ALPRs "ha[ve] been around for several decades, and in that time, numerous criminal cases have noted it's [sic] use . . . includ[ing] various district courts within the 8th Circuit." Filing 69 at 2 (citing *United States v. Kirkendoll*, No. 19-00214-2, 2021 WL 653025 (W.D. Mo. Feb. 19, 2021); *United States v. Williams*, No. 22-CR-92, 2023 WL 4761534 (N.D. Iowa July 26, 2023); *United States v. Dancy*, No. 22-166, 2023 WL 3336807 (D. Minn. May 10, 2023); *United States v. Padilla*, No. 4:15-CR-00144, 2016 WL 3546303 (E.D. Ark. June 6, 23, 2023)).

### 2. *Applicable Standards*

A "search" within the meaning of the Fourth Amendment occurs when "[t]he Government physically occupie[s] [or intrudes on] private property for the purpose of obtaining information," *United States v. Jones*, 565 U.S. 400, 404 (2012), or when the Government intrudes on something

that "an individual 'seeks to preserve [ ] as private,' and his expectation of privacy is 'one that society is prepared to recognize as reasonable,'" *Carpenter v. United States*, 585 U.S. 296, 304 (2018) (quoting *Smith v. Maryland*, 442 U.S. 735, 740 (1979)). Fourth Amendment "analysis is informed by historical understandings 'of what was deemed an unreasonable search and seizure when [the Fourth Amendment] was adopted.'" *Carpenter*, 585 U.S. at 305. The "basic purpose" of the Fourth Amendment "is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials." *Carpenter*, 585 U.S. at 303 (quoting *Camara v. Mun. Ct. of City and Cnty. of S.F.*, 387 U.S. 523, 528 (1967)).

In *Jones*, the Supreme Court held that "the Government's installation of a GPS device on a target's vehicle, and its use of that device to monitor the vehicle's movements, constitute[d] a 'search.'" *Jones*, 565 U.S. at 404. The Court reasoned that where the Government commits a "common-law trespass" against an individual's property, a "search" has occurred. *Id.* at 405. While acknowledging that Fourth Amendment jurisprudence "ha[s] deviated from [an] exclusively property-based approach," the Court emphasized the importance of considering "the meaning of the Fourth Amendment when it was adopted." *Id.* Applying this standard, the Court had "no doubt that such a physical intrusion would have been considered a 'search'" at the time of the Founding. *Id.*

In *Carpenter*, the Supreme Court held that "an individual maintains a legitimate expectation of privacy in the record of his physical movements as captured through [cell-site location information (CSLI)]" and that such "location information obtained from [ ] wireless carriers was the product of a search." 585 U.S. at 310. The Court recognized "society's expectation . . . that law enforcement agents and others would not . . . secretly monitor and catalogue every

single movement of an individual's car for a very long period." *Id.* (citation omitted). "Allowing government access to cell-site records contravene[d] that expectation" by "provid[ing] an intimate window into a person's life, revealing not only his particular movements, but through them his 'familial, political, professional, religious, and sexual associations.'" *Id.* at 311 (citation omitted). The Court highlighted the "remarkably easy, cheap, and efficient" tracking technology "compared to traditional investigative tools," noting that "[w]ith just the click of a button, the Government can access each carrier's deep repository of historical location information at practically no expense." *Id.* The Court distinguished cell phones from cars, as follows:

> Unlike . . . the car in *Jones*, a cell phone—almost a "feature of human anatomy," *Riley* [*v. California*, 573 U.S. 373, 385 (2014)]—tracks nearly exactly the movements of its owner. While individuals regularly leave their vehicles, they compulsively carry cell phones with them all the time. A cell phone faithfully follows its owner beyond public thoroughfares and into private residences, doctor's offices, political headquarters, and other potentially revealing locales. *See id.* at [395] (noting that "nearly three-quarters of smart phone users report being within five feet of their phones most of the time, with 12% admitting that they even use their phones in the shower"); contrast *Cardwell v. Lewis*, 417 U.S. 583, 590, 94 S.Ct. 2464, 41 L.Ed.2d 325 (1974) (plurality opinion) ("A car has little capacity for escaping public scrutiny."). Accordingly, when the Government tracks the location of a cell phone it achieves near perfect surveillance, as if it had attached an ankle monitor to the phone's user.

*Carpenter*, 585 U.S. at 311–12. The warrantless use of CSLI violated the Fourth Amendment by "effectively . . . tail[ing] [the suspect] every moment of every day for five years." *Id.* at 312.

Because there is no Eighth Circuit caselaw on the constitutionality of consulting ALPR databases, the Court will survey persuasive authority from other circuits cited by the Government. In a concurring opinion in *United States v. Yang*, Judge Bea of the Ninth Circuit stated his view that "search of the [ALPR] database did not require a warrant because the information in the database did not reveal 'the whole of [the defendant's] physical movements,' and therefore did not

32

infringe on that reasonable expectation of privacy." 958 F.3d 851, 862 (9th Cir. 2020) (quoting *Carpenter*, 585 U.S. at 313).[11] Judge Bea rejected the defendant's argument that use of the ALPRs "allowed the government to achieve 'near perfect surveillance, as if it had attached an ankle monitor to the phone's user,'" or "provided the government [ ] with the same degree of information [as the cell phone in *Carpenter*] and thus required a warrant to access it." *Id.* (quoting *Carpenter*, 585 U.S. at 310). Judge Bea noted that the defendant "had been observed only once by ALPRs that uploaded location information to the LEARN database, despite having been driven more than 105,000 miles." *Id.* To Judge Bea, this singular entry "exposed nothing else about [the defendant's] 'particular movements' whatsoever." *Id.* at 863 (quoting *Carpenter*, 585 U.S. at 310). "The government learned no information about [the suspect's] 'familial, political, professional, religious, and sexual associations,' when it ran the search for the [suspect's] license plate." *Id.* (citations omitted). Although these differences sufficed for Judge Bea to distinguish *Carpenter*, Judge Bea also observed that "ALPRs *may* in time present many of the same issues the Supreme Court highlighted in Carpenter," explaining:

> ALPRs can effortlessly, and automatically, create voluminous databases of vehicle location information. If enough data is collected and aggregated, this could have the ability to identify quickly and easily the precise whereabouts and lifestyle habits of those whose vehicle information is recorded. ALPRs also collect information without individualized suspicion, and records can be maintained for years. In retrospective searches, detailed and potentially private information may be exposed, though it is debatable whether license plate location data would ever provide the same "near perfect surveillance" that cell phone location data does. *See Carpenter*, 138 S. Ct. at 2218.

*Yang*, 958 F.3d at 863 (emphasis in original).

---

[11] The ALPR system at issue in *Yang* is also operated by a company called Vigilant. 958 F.3d at 851; *see also* Filing 60 at 49 (Deputy Parmer testifying that "the system we use is called Vigilant").

In *Leaders of a Beautiful Struggle*, the Fourth Circuit sitting *en banc* held that accessing data without a warrant from Baltimore's surveillance system—which integrated "new aerial technology," meaning "planes equipped with high-tech cameras," with the city's "dispatch system, 'CitiWatch' security cameras, 'Shot Spotter' gunshot detection, and license plate readers"— violated the Fourth Amendment. 2 F.4th at 333. The Fourth Circuit determined that the surveillance system was unconstitutional because it "'track[ed] every movement' of every person outside in Baltimore," "retained [the data] for 45 days," and permitted "[l]aw enforcement [to] 'travel back in time' to observe a target's movements, forwards and backwards." *Id.* at 341 (quoting *Carpenter*, 585 U.S. at 307–13). As such, using the surveillance system was "more like 'attach[ing] an ankle monitor' to every person in the city." *Id.* Accordingly, the Fourth Circuit enjoined use of the surveillance system. *Id.* at 348.

### 3. Accessing the ALPR Database Is Not a Search Within the Meaning of the Fourth Amendment

Deputy Parmer's use of the ALPR database did not constitute a "search" within the meaning of the Fourth Amendment. Deputy Parmer testified that over the six months preceding the arrest of Defendants, the Equinox generated "only five or six" hits, which Deputy Parmer called, "Not very many." Filing 60 at 50. In the few days preceding Defendants' arrest on March 2, 2023, the ALPRs registered the Equinox twice: first, on I-70 West near De Beque, Colorado, on February 27, 2023, at 5:22 PM; and second, on I-70 East near Clifton, Colorado, on March 1, 2023,

34

at 11:28 PM. Filing 57 (Ex. 110).[12] Contrary to Defendants' arguments, this case is easily distinguishable from *Jones* and *Carpenter*.

As discussed above, the Supreme Court in *Jones* stated that a "search" occurred when the Government installed a GPS device on a suspect's vehicle and used the device to track the vehicle, emphasizing that "such a physical intrusion would have been considered a 'search' within the meaning of the Fourth Amendment when it was adopted." 565 U.S. at 404–05. Here, there was no physical intrusion by the Government to any private property. The ALPRs that registered the Equinox on February 27, 2023, and March 1, 2023, were stationed beside a public highway, I-70. Filing 57 (Ex. 110). Furthermore, the entity that produced these cameras and operates the ALPR database, Vigilant, appears to be a private company. Filing 60 at 49–50; *Yang*, 958 F.3d at 853 (referring to "the largest license plate-location database in the country, operated by a private company called Vigilant Solutions"). Because there was no governmental intrusion onto private property, there was no "search" under the "common-law trespass" approach. *Jones*, 565 U.S. 405.

Similarly, this is not a case where "society's expectation . . . that law enforcement agents and others would not . . . secretly monitor and catalogue every single movement of an individual's car for a very long period" is implicated. *Carpenter*, 585 U.S. at 310. Although, as the present case shows, law enforcement can utilize the ALPR database to receive location information on individual cars over lengthy periods, the ALPR database is substantially limited relative to a GPS monitor, as in *Jones*, or cell-site location information, as in *Carpenter*. Unlike cell phones, ALPRs do not "faithfully follow[ ] [their] owner[s] beyond public thoroughfares and into private

---

[12] Both De Beque and Clifton are in Mesa County, Colorado, the county seat of which is Grand Junction, Colorado. Deputy Parmer testified that the ALPRs capture the Equinox as it passed through Grand Junction. Filing 60 at 23.

residences, doctor's offices, political headquarters, and other potentially revealing locales." *Id.* at 311. Also unlike cell phones, license plates are not akin to "feature[s] of human anatomy," such that tracking a license plate "achieves near perfect surveillance, as if [the Government] had attached an ankle monitor" to the suspect. *Id.* at 311–12. Nor is this a case where "time-stamped data provides an intimate window into a person's life.'" *Id.* at 311. To the contrary, the ALPR database only reveals when, where, and in which direction a certain vehicle was driving— information of limited value, and data from which it is difficult to discern an individual's "familial, political, professional, religious, and sexual associations." *Id.* Further distinguishing the present case from *Carpenter* is the sheer frequency of pinpoints. In *Carpenter*, "the Government obtained 12,898 location points cataloging [the suspect's] movements—an average of 101 data points per day." *Id.* at 302. Conversely, the ALPR database only had five or six "hits" on the Equinox over the past six months—an average of one data point per month. Filing 60 at 50. Because the data gathered by ALPRs is of such limited volume and utility, unlike GPS or cell-site location information, Deputy Parmer did not perform a "search" within the meaning of the Fourth Amendment when he accessed the ALPR database.

Judge Bea's observations in *Yang* regarding ALPRs ring true in this case. In *Yang*, the defendant argued that the ALPR "database provided the government here with the same degree of information [as the CSLI in *Carpenter*] and thus required a warrant to access it." 958 F.3d at 862. Noting the Supreme Court's dictate in *Carpenter* that "individuals have a reasonable expectation of privacy in the whole of their physical movements," Judge Bea found defendant's argument "falls apart under the barest of scrutiny." *Id.* Rather, "the database search [failed to] reveal the whole, or even any, of [the defendant's] physical movements." *Id.* at 864. Judge Bea further

36

observed that that "ALPRs *may* in time present many of the same issues the Supreme Court highlighted in *Carpenter*." *Yang*, 958 F.3d at 863 (emphasis in original). Perhaps the surveillance system at issue in *Leaders of a Beautiful Struggle* provides a good example. The Fourth Circuit found that use of the surveillance system constituted a *Carpenter*-type search. *Leaders of a Beautiful Struggle*, 2 F.4th at 341. The City of Baltimore used ALPRs in conjunction with several other technologies, including "aerial photography," the police department's "dispatch system, 'CitiWatch' security cameras, [and] 'Shot Spotter' gunshot detection." *Id.* at 334. The effect of these technologies in combination was "obtaining an estimated twelve hours of coverage of around 90% of the city each day" which "can be magnified to a point where people and cars are individually visible." *Id.* Plainly, the surveillance system in *Leaders of a Beautiful Struggle* is much more extensive than the ALPRs addressed by Judge Bea in *Yang* and at issue here.

Therefore, the Court agrees with the Government that accessing the ALPR database is not a "search" within the meaning of the Fourth Amendment. Deputy Parmer validly relied on information obtained from the database in prolonging Defendants' detention. However, as discussed in the previous section, even if accessing the database constituted an unlawful "search," Deputy Parmer had reasonable suspicion independent of the ALPRs. Therefore, Defendants' Motions to Suppress are denied.

### III. CONCLUSION

For these reasons, and upon *de novo* review, the Court agrees with the findings and conclusions reached by Judge Bazis. Deputy Parmer had probable cause to stop the Equinox. He also had reasonable suspicion to prolong Defendants' detention while he conducted a dog sniff. Moreover, Deputy Parmer did not perform a "search" within the meaning of the Fourth

Amendment when he accessed the ALPR database. Even if accessing the ALPR database constituted a "search," Deputy Parmer had reasonable suspicion independent of information learned from the ALPR database to prolong Defendants' detention. Accordingly, because Defendants have failed to identify any unlawful search or seizure, their Motions to Suppress are denied. In addition, Defendants' Motions to Dismiss are meritless under existing Eighth Circuit precedent, as Defendants concede, and are also denied. Defendants' objections lack merit, and all other issues that have not been raised by Defendants have been waived. Accordingly,

IT IS ORDERED:

1. Defendant Jiles's Statement of Objections, Filing 62, is overruled;

2. Defendant Washington's Statement of Objections, Filing 66, is overruled;

3. Judge Bazis's findings of fact and conclusions that the Motions should be denied, Filing 61, are accepted;

4. Defendant Jiles's Motion to Suppress, Filing 26, is denied;

5. Defendant Jiles's Motion to Dismiss, Filing 28, is denied;

6. Defendant Washington's Motion to Suppress, Filing 48, is denied; and

7. Defendant Washington's Motion to Dismiss, Filing 50, is denied.

Dated this 29th day of February, 2024.

BY THE COURT:

_____
Brian C. Buescher
United States District Judge